Filed 11/18/14  Zeiny v. Santa Clara Valley Medical Center CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| AL ZEINY,<br><br>　　　　Plaintiff and Appellant,<br><br>　　　　v.<br><br>SANTA CLARA VALLEY MEDICAL CENTER,<br><br>　　　　Defendant and Respondent. | H039758<br>(Santa Clara County<br>Super. Ct. No. 1-13-CV243572) |

Plaintiff Al Zeiny brought this action for medical malpractice and intentional infliction of emotional distress against defendant Santa Clara Valley Medical Center (VMC), an enterprise of the County of Santa Clara (the County).  He brought the action without first submitting a claim under the Government Claims Act, Government Code sections 810 et sequitur, and after the time to submit such a claim had expired.  (See Gov. Code, §§ 905, 911.2, subd. (a).)  After learning of his error, he submitted a claim to the County, which was denied, and then petitioned the superior court for relief from the claim requirement.  (See Gov. Code, § 946.6.)  He appeals from the court's denial of that petition.  We find no error, and affirm.

On August 13, 2012, plaintiff called 911 and stated that he "wanted to jump in front of a train." Police took him to VMC for 72-hour observation and treatment pursuant to Welfare and Institutions Code sections 5150 et sequitur. His psychiatrist told a nurse that among the psychotropic medications he was supposed to be taking was 4 milligrams per day of Risperdal.[2] A physician's order made at 3:30 in the afternoon, and signed by Drs. Johnson and Lotfi, called for plaintiff to receive "Risperdal PO 4mg qhs" (i.e., every night at bedtime) plus "Ativan 2 mg PO x1 tonight" (i.e., one time that night).

Apparently around 6:30 that evening, an order was made for plaintiff's transfer to the John Muir Behavioral Health Center in Concord (John Muir). According to plaintiff, a vehicle arrived for that purpose at 8:30 p.m. Apparently at that same time, a VMC nurse gave plaintiff the Ativan and Risperdal that VMC doctors had ordered.

Upon his arrival at John Muir, plaintiff exhibited "somnolence, hypokalemia [low potassium levels], hypotension and encephalopathy secondary to medication effect." Case notes at John Muir specifically attributed these conditions to the Ativan and Risperdal he had received at VMC. As a result of these conditions he was "transferred [to the] emergency room for medical stabilization." After the administration of potassium the conditions appeared to be resolved.

On August 14, 2012, plaintiff wrote a six-page handwritten note expressing the belief that he had been mistreated in various respects by personnel at both VMC and John Muir. Most pertinently he wrote that the former had "over dosed me with 2 mg Ativan

---

[1] The facts recited here are reflected in documents plaintiff submitted to the court below in support of his claims. No issue has been made of their admissibility or the purposes for which their contents may be accepted as true.

[2] Risperdal is also known, and is intermittently referred to throughout the record, as Risperidone.

and 4 mg Risperdal" despite his having informed them that he was "not taking either [of those medications] any more." He concluded with the notation, "I left copy to be placed in my chart to be an evidence later in the malpractice lawsuit that I will file later."

On September 13, 2012, plaintiff wrote to VMC requesting an "explanation for the incident on August 13, 2012." In addition to attaching his note of August 14, he posed a series of questions for "Investigation and Explanation" as well as "Reasons for my Suspicions." The latter included the possibility that, as a result of litigation he was pursuing against "renegade CIA officials," they or their FBI allies might have "provided misleading medical and nonmedical background information to the physician who ordered the 4mg Respiridone and 2mg of Ativan."

On October 12, 2012, a representative of VMC's customer service department wrote to plaintiff expressing regret that he was dissatisfied with the services he had received. At the bottom of the letter appeared the inscription, "Santa Clara Valley Medical Center is owned and operated by the County of Santa Clara."

On March 25, 2013, plaintiff filed a complaint against VMC seeking damages for personal injury.[3] On March 26, according to plaintiff, he tried to serve the complaint on VMC but was told that it is a public entity, and was directed to county counsel.

On March 27, 2013, plaintiff promulgated a "Claim Against the County of Santa Clara" asserting that he had been the victim of medical practice on August 13, 2012. The claim also asserted a cause of action for intentional infliction of emotional distress, based on the asserted fact that VMC allowed one Dr. Lotfi to treat plaintiff despite its knowledge that Dr. Lotfi "is not registered as a licensed medical doctor in the Medical Board of California" and "doesn't have the requirement necessary to treat" plaintiff. Plaintiff asserted that he was "confident" of his compliance with the 6-month filing

---

[3] No statement of the operative facts appears in the complaint, which was ultimately dismissed without prejudice by stipulated order.

deadline (see Gov. Code, § 911.2), but added that if the County did not agree, he sought "leave to present the claim after the 6-month period has expired."

On April 15, 2013, the county issued a notice denying plaintiff's application for leave to file a late claim, and a further notice stating that his substantive claim was being returned without action "because it was not presented within six months after the event or occurrence as required by law."

On May 1, 2013, plaintiff filed a petition in the superior court action for leave to proceed against the the county pursuant to Government Code section 946.6. In support of the petition he asserted that his failure to file a timely claim was justified by his "delayed discovery" of the claim. He contended that insofar as his claim rested on the negligent prescription of medications, it did not accrue until November 8, 2012, when he received records of his treatment from VMC. He also suggested that insofar as his claims rested on Dr. Lotfi's asserted lack of necessary credentials, they did not accrue until March 27, 2013, when he learned of that fact by searching for his name using "the license look up tool in the medical board of California web site."

The county filed opposition to the petition for relief, asserting that plaintiff had ample knowledge of his potential claim the day after the acts of which he complained. In reply, plaintiff freely admitted that he had suspicions of malpractice "as early as 14 August 2012," when he had written notes in which "stated explicitly the intent . . . to file a malpractice lawsuit." He asserted, however, that "his suspicions were meritless until he received his medical records . . . on 8 November 2012." The county's opposition, he further asserted, had "ignored" his claim for intentional infliction of emotional distress, which only accrued when he learned of Dr. Lotfi's supposed lack of credentials. He asserted that relief was warranted because he had been acting "under the false impression that [VMC] was a private hospital," only learning of its true status on March 26, 2013, when he served process on VMC. He further asserted that relief should be granted

4

because (1) his letter put VMC on notice that he was going to file a malpractice suit against it; (2) VMC's reply failed to warn about the claim filing requirements; and (3) his claims are "too [s]erious to be [d]ismissed."

On May 28, the court signed an order denying the petition for relief from the claims requirements "on the grounds that Petitioner failed to demonstrate sufficient facts upon which the Court may grant relief under California Government Code section 946.6." Plaintiff filed this timely appeal.

DISCUSSION

## I.    *Delayed Accrual*

Plaintiff asserts that his cause of action for legal malpractice did not accrue until he received copies of his medical records. This assertion cannot be sustained. On the day after the supposed malpractice occurred, he memorialized the circumstances in a handwritten note containing all the material facts on which the malpractice claim rested. He wrote that he had been taken to the John Muir emergency room "because doctor David Johnson [of VMC] . . . overdosed me with 2 mg Ativan and 4 mg Risperdal." He was told that he had "passed out," "had very low blood pressure," and "didn't feel anything until the next day at noon." He included numerous details apparently intended to show that VMC personnel should have known that he could not safely ingest these medications in these quantities. He closed with the recital that he had left a copy of the note "to be placed in my chart to be an evidence later in the malpractice lawsuit that I will file later." The note thus establishes not only plaintiff's actual knowledge of the facts constituting the claim, but his actual intent to file such a claim.

About a month later, in a letter to VMC, plaintiff again recited the operative facts, reporting that when he arrived at John Muir, nurses had been unable to wake him, his blood pressure had gone "down to the sixties," and staff had "rushed me to the emergency room to save my life."

5

All of this information preceded plaintiff's receipt of medical records from VMC. The only new information he attributes to those materials is a document referring to the possibility of administering as much as 16 mg of Risperidone. Plaintiff interprets this document as evidence that "Dr. Lotfi prescribed 16 mg of Risperidone to Plaintiff that would have killed him immediately." But this document adds nothing to any colorable malpractice claim. Contrary to his interpretation, the record does not indicate that 16 milligrams of Risperidone were ever "prescribed." It is a form entitled "Acute Psychiatric Services Informed Consent for Psychoactive Medications," and its manifest function is simply to memorialize the patient's consent to a broad treatment plan. As pertinent here, it sets out the doctor's "recommend[ation]" that plaintiff "take the medication(s) indicated below, *up to* the specified doses." (Italics added.) Three medications are listed, including Risperdal "*up to* 16 mg per day." (Italics added.) The form memorializes advisements to plaintiff that he had a "right to refuse medication except in emergencies," and to "withdraw consent for medication at any time by informing a staff member." It indicates that he "agree[d] verbally" to its contents, and bears a witness's signature to that effect.

The consent form shows at most that plaintiffs doctors *contemplated the possibility* that "up to" 16 mg of Risperdal might be called for. Plaintiff has never claimed that such a dosage was ever given to him. On the contrary, he has consistently stated, and the record shows, that he was given 4 mg. Indeed, according to him he "would have definitely died" if the larger dose had been administered. The fact that Dr. Lotfi sought plaintiff's consent to administer a higher dose *if necessary* is irrelevant to any malpractice cause of action, for even if would have been negligent to contemplate such a dosage, "a negligent act is not actionable unless it results in injury to another." (*Fields v. Napa Mill. Co.* (1958) 164 Cal.App.2d 442, 447.)

6

Plaintiff has also contended that even assuming his medical malpractice claim accrued at an earlier time, his claim for intentional infliction of emotional distress did not accrue until he learned of Dr. Lotfi's supposed lack of qualifications to practice medicine. He claimed to have learned of this supposed fact on March 27, 2013, by consulting the website of the Medical Board of California, which listed two licensed physicians with the last name of Lotfi, both of whom he apparently ruled out as the person who treated him at VMC. But assuming the person who treated him lacked a medical license, the discovery of that fact would not have given rise to, or notice of, a cause of action for intentional infliction of emotional distress. Assuming that such a claim could be predicated on the unlawful practice of medicine, the mere absence of Dr. Lotfi's name from the license database did not establish that he was practicing unlawfully. The prohibition against practicing medicine without a license (Bus. & Prof. Code, § 2052) is subject to exceptions, including exemptions for medical students, postgraduate trainees, interns, and residents. (Bus. & Prof. Code, §§ 2064, 2065.) For all this record shows—and all plaintiff could know from the limited research he conducted—Dr. Lotfi was an intern, resident, or graduate trainee lawfully practicing under such an exemption. Assuming plaintiff suffered emotional distress as a result of his discovery, it would seem to be the product of his own inadequate research.[4]

Plaintiff also asserts in his brief that when he visited VMC to serve process on March 26, 2013, he "was told that Lotfi does not and did not work for SCVMC." The record contains no direct averment to this effect, but only the oblique statement that until

---

[4] A more diligent search might have uncovered a May 2012 press release in which the School of Medicine at the University of California at Davis identified Justin Lotfi as one of "[m]ore than 80 graduating UC Davis medical students" who were honored at that time. (UC Davis School of Medicine announces students and faculty awarded for excellence <http://www.ucdmc.ucdavis.edu/publish/news/newsroom/6590> (as of Nov. 5, 2014).)

March 27, 2013, plaintiff "was totally ignorant to the fact that the person called Dr. Lotfi . . . does not work for Santa Clara Valley Medical Center."  We decline to guess at the meaning of the fact thus implied, or its bearing on any potential claim.  In the absence of any coherent showing to the contrary, we must assume that in treating plaintiff, Dr. Lotfi was acting lawfully and without fault on his part or VMC's.

In sum, nothing in the record sustains plaintiff's assertion that his claims were subject to delayed accrual.

## II. *Mistake, Surprise, Excusable Neglect*

In his reply to defendant's opposition to his petition for relief, plaintiff asserted for the first time that his failure to submit a timely claim to the county was the product of mistake, surprise, and excusable neglect.  The mistake, he asserted, was his acting "under the false impression that [VMC] was a private hospital."  He said that he only learned of its true status on March 26, 2013, when he served process on VMC.  Accepting this statement as true, it does not establish cause for relief in the absence of some indication that plaintiff made the mistake *despite the exercise of reasonable diligence*.

The present case is materially identical to previous decisions in which plaintiffs have sought relief from the claims statute on the ground that they did not realize the defendant hospital was publicly owned.  In *Rojes v. Riverside General Hospital* (1988) 203 Cal.App.3d 1151 (overruled on other grounds in *Passavanti v. Williams* (1990) 225 Cal.App.3d 1602, 1607-1608), the plaintiff sought relief after a county hospital demurred to his complaint for failure to file the required pre-suit claim.  He declared that he had not realized the hospital was a county facility until his attorney told him so.  (*Id.* at p. 1156.)  The county submitted a form he had signed at admission acknowledging an obligation to reimburse the county for expenses, as well as billing envelopes reciting that the hospital was  " 'A Department of the County of Riverside—a public entity.' "  (*Id.* at p. 1157.)  In support of a motion for reconsideration the plaintiff declared that he was in shock at the

8

time of admission, that no one had told him the hospital was a public entity, and that he had thrown away the billing envelopes without noticing the inscription on them. (*Id.* at pp. 1157-1158.) The trial court denied relief, and the Court of Appeal affirmed: " '[A] petitioner or his attorney must show more than that they did not discover a fact until too late; they must establish that in the use of reasonable diligence they failed to discover it. [Citations.]' [Citations.] Here there is no evidence that Rojes or his attorney exercised reasonable diligence in an attempt to determine if Riverside General was a public entity. Nor is there any evidence concerning when Rojes retained his attorney or of any affirmative action taken by Rojes's attorney to ascertain whether Riverside General was a public entity." (*Id.* at p. 1163, fn. omitted.) Because the plaintiff had received notice of the hospital's status by way of the admissions form and the billing envelopes, he had " 'failed to carry his burden of proof to demonstrate surprise, mistake, excusable neglect, or inadvertence.' " (*Ibid.*; see also *Lutz v. Tri–City Hospital* (1986) 179 Cal.App.3d 807, 810 [plaintiff's profession of surprise at hospital's public entity status held not to warrant relief where he had signed forms and received billing records describing hospital as a " 'Local Hospital District' "].)

Here too the hospital placed plaintiff on notice of its public entity status by describing itself in its letter of October 12, 2012, as "owned and operated by the County of Santa Clara." In view of this recital, plaintiff's mere profession of ignorance was insufficient to sustain his petition for relief from the claims statute.

Plaintiff cites *Bettencourt v. Los Rios Comm. Coll. Dist.* (1986) 42 Cal.3d 270, where the Supreme Court found an abuse of discretion in the trial court's denial of relief. But the plaintiffs' attorney there had launched an investigation as soon as he was engaged, and filed a claim four days later; his error was not in neglecting the possibility that the defendant was a public entity, but in identifying the *correct* public entity. Here in contrast plaintiff took no steps to ascertain the ownership of VMC until he attempted to

9

serve process and was informed of its public entity status. Such lack of diligence provided ample basis for the trial court to deny relief.

## DISPOSITION

The order denying relief from the claims requirements is affirmed.

10

_____

RUSHING, P.J.

WE CONCUR:

_____

PREMO, J.

_____

ELIA, J.

11